**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. <u>R.</u> 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-1055-18

STATE OF NEW JERSEY,

     Plaintiff-Respondent,

v.

ARTURO I. ALOMAS,
a/k/a ARTURO ALOMAS
and JAMAL WILLIAMS,

     Defendant-Appellant.

_____

Submitted January 4, 2021 – Decided April 30, 2021

Before Judges Hoffman, Suter and Smith.

On appeal from the Superior Court of New Jersey, Law Division, Union County, Indictment No. 16-08-0560.

Joseph E. Krakora, Public Defender, attorney for appellant (Seth Spiegal, Designated Counsel, on the briefs).

Lyndsay V. Ruotolo, Acting Union County Prosecutor, attorney for respondent (Meredith L. Balo, Special Deputy Attorney General/Acting Assistant Prosecutor, of counsel and on the brief).

PER CURIAM

Defendant, Arturo I. Alomas, appeals his judgment of conviction. In this matter we consider whether the trial court committed reversible error by admitting evidence of a witness's out-of-court identification of defendant, and by giving a flight charge to the jury. We also consider whether the trial court erred in sentencing defendant to a seventy-five-year life term of incarceration with eighty-five percent parole ineligibility. We affirm as to each issue for the reasons set forth below.

I.

In March 2016, Trencie Johnson was in a relationship with defendant. They lived together in the Mravlag Manor apartment complex, Building 30.

Saturday, March 26th was Ms. Johnson's birthday, so that weekend Ms. Johnson and her friends and family members went out to celebrate while defendant stayed home and watched their two-month-old child. Johnson and friends went to a nightclub between 11 p.m. and midnight and left the club between 2 a.m. and 2:30 a.m. the next morning.

Also on March 26th, Kadijah Hix attended a friend's party at Mravlag Manor in Building 36 that lasted from Saturday night to early Sunday morning. During the party, she had one beer. Around 4 a.m., Ms. Hix stepped outside the apartment to get some air. While outside, Ms. Hix saw defendant walking from

2

the apartment he shared with Ms. Johnson. She observed defendant walking quickly, carrying something that looked like a bag in his hand. She saw the side and back of defendant's head at that moment, but not his face. Ms. Hix sold children's clothes to Ms. Johnson and defendant approximately eight times in the previous two weeks. From these previous sales, Ms. Hix was able to take note of defendant's head and face, complexion, physical body shape, how defendant walked, and his mannerisms.

Later that day, during a phone conversation, Ms. Hix learned from her sister that "something happened" to Ms. Johnson. Ms. Hix told her sister she had seen defendant earlier that morning when she stepped outside of the party at 4:00 a.m.

The next day, March 27, 2016, two of Ms. Johnson's cousins and her mother went to Ms. Johnson's apartment. When they got there, they could not open the door, so they started knocking and calling Ms. Johnson's name. When they finally entered the apartment, they found Ms. Johnson laying on the floor with a bag over her face. There was a wire tied around her neck and duct tape used to restrain her wrists and feet. Defendant and the infant child were not at the apartment.

A-1055-18

That same day, North Carolina State Trooper Denny Morgan noticed defendant's Dodge Magnum driving down I-85 because it had blue lights in the fog lamps. Trooper Morgan pursued defendant and eventually pulled him over. Defendant's driver side wheels were on the fog line. Trooper Morgan got on his vehicle's PA to tell defendant to move his car over. Defendant did not move over. Trooper Morgan moved his patrol car closer to defendant's before he got out of his patrol car. As Morgan emerged from his car, defendant pulled off and sped down the interstate. Trooper Morgan gave chase and caught defendant again. Once both cars stopped, he ordered defendant to get out of his car with his hands up. Defendant complied and Morgan handcuffed defendant. When Trooper Morgan checked the car, he observed a child inside. He notified the Department of Child Services to pick up the child. Further, Trooper Morgan discovered that this car was registered to Ms. Johnson.

Shortly after the chase, State Trooper Kevin Barringer arrived. Defendant gave him permission to remove the child from the car. While in the car Trooper Barringer observed that the vehicle's cargo area was loaded to the ceiling with trash bags containing baby clothes, among other items. Barringer also saw a purse and two cell phones. Trooper Barringer used those phones to talk to defendant's mother and other individuals who were calling both phones.

4

A-1055-18

Barringer spoke to defendant's mother from his phone, while on one of the other phones Barringer talked to "various individuals, some female and at least one male."

On August 24, 2016, defendant was indicted for first-degree murder. He filed a Wade/Henderson[1] motion to suppress the out-of-court identification of him by Ms. Hix. The court conducted the hearing on June 20, 2018 and denied defendant's motion that same day. After trial, a jury found defendant guilty of murder. The trial court sentenced defendant to a seventy-five-year extended life term subject to eighty-five percent parole ineligibility. Defendant filed a timely notice of appeal.

II.

The Wade/Henderson Motion

At the hearing, Ms. Hix testified about the party she attended at Mravlag Manor, Building 36, Apartment A the night of March 26 and into the early morning hours of March 27. She had one beer at the party. Between 3 a.m. and 4 a.m., Ms. Hix stepped out of the apartment into the hallway. She described the weather as breezy and clear, with a temperature of fifty to sixty degrees.

---

[1] United States v. Wade, 388 U.S. 218 (1967) and State v. Henderson, 208 N.J. 208 (2011).

While in the hallway she saw a bald light-skinned man wearing a green jacket in the courtyard. He was walking from Building 30, Ms. Johnson's apartment building. Ms. Hix said he was about a two-minute walk away from where she was in the hallway of Building 36; but she also testified it was the distance from the witness box to the back of the courtroom, fifty-two feet.[2] She identified the bald man as Ms. Johnson's boyfriend, defendant, although she did not know his name. Ms. Hix testified that he looked like he had a bag in his hands when he was walking across the courtyard. She went back into the apartment after she lost sight of defendant. Later that day, Ms. Hix's sister called to tell her that Ms. Johnson had been killed. Ms. Hix remembered what she saw early that morning and called her sister back. Although the conversation with her sister shocked her, it did not change what she thought she saw before talking to her. Ms. Hix recognized defendant from having visited Ms. Johnson's apartment approximately eight times to sell her baby's clothes before March 27. Defendant paid Ms. Hix on those visits.

---

[2] At the conclusion of trial, the court informed the jury that the parties stipulated to a distance of three-hundred and twenty-eight feet between the apartment where Ms. Hix was partying, and defendant's apartment that he shared with Ms. Johnson.

A-1055-18

Ms. Hix also testified about her interview with the detectives. She described defendant to them before they showed her a picture of him. She did not feel as if she had to identify anyone nor did she "feel pressured in any way". She was 100 percent sure defendant was the person she saw walking in the courtyard that morning.

One of the detectives showed Ms. Hix a picture of defendant and asked if the picture looked like the person she saw, she replied "[t]hat's him." Ms. Hix testified that after the detectives showed her the picture of defendant, they did not show Ms. Hix any other pictures. The detectives did not tell her that she "had no obligation to pick out anybody" or that the picture she was shown "may not be the person [they are] talking about."

Detective Christopher Scuorzo from the Union County Prosecutor's Office testified. He interviewed Ms. Hix along with Detective Sophia Santos. Before starting her interview, he admitted that the two detectives did not give any instruction[3] to Ms. Hix. Detective Scuorzo summarized Ms. Hix's interview: "she saw a male exiting the Mravlag apartment building in the early hours, I

---

[3] "The detective[s] made no mention of having warned the victim that the suspect might not have been the perpetrator and that the victim should not feel compelled to make an identification, as is required by the Attorney General Eyewitness ID Guidelines and Henderson." State v. Wright, 444 N.J. Super. 347, 354 n.3 (App. Div. 2016) (citing Henderson 208 N.J. at 261).

believe, somewhere around the 4:00 a.m. hour, who she recognized to be someone that she knew."

Detective Scuorzo also admitted the detectives did not perform a double-blind identification procedure, nor did they employ filler pictures during the process. They only showed Ms. Hix the one photograph of defendant. Detective Scuorzo explained that "[p]rior to showing her the photograph we felt we had established that she did, in fact, describe and know the [defendant] on a basis where she was able to be shown a one-on-one photograph and we were satisfied with that."

The trial court rendered an oral decision using the system and estimator variables[4] established in Henderson, 208 N.J. at 248–67. Analyzing system variables first, the court found the detectives failed to conduct a blind administration of the photo identification process. The detectives were directly involved in the homicide investigation and knew defendant's identity.

---

[4] "System variables" are factors relating to the identification that are within the State's control and include such things as lineup or showup construction, blind administration, pre-identification instructions, avoiding feedback and recording confidence. Wright, 444 N.J. Super. at 354 n.5 (citing Henderson 208 N.J. at 248–67). "Estimator variables" are factors over which the State has no control as they relate to the witness, the perpetrator, or the event itself and include such things as distance and lighting, duration, weapon focus, race bias and stress. Ibid.

A-1055-18

Additionally, the detectives did not provide Ms. Hix with pre-identification instructions, nor did they employ a photo line-up. The trial court concluded that the detective's photo identification process was impermissibly suggestive.

The court next analyzed the estimator variables, and it found Ms. Hix credible. It found she had the opportunity to see "the way defendant walks and the structure of his head," "albeit from the back, but with convincing recall." The court reviewed the facts as related by Ms. Hix, including distance, ambient lighting, Ms. Hix's previous interactions with defendant, and the time interval between Ms. Hix's sighting of defendant at 4 a.m. on March 27th and her identification of defendant for the detectives at 10 p.m. the same day. The court acknowledged Ms. Hix had one beer around 10 p.m. Saturday night and that she stayed up until dawn. Nonetheless, the court found Ms. Hix's "sure" photo identification of defendant reliable based on the credible evidence in the record. The court next found defendant failed to show a substantial likelihood of misidentification, notwithstanding the impermissibly suggestive identification procedure used by the detectives. Consequently, the court denied defendant's motion to suppress Ms. Hix's out-of-court identification.

Flight Jury Charge

9

At the charge conference, the court noted there were no lesser charges, only first-degree murder. The trial court then made the following observations about the upcoming charge on the record:

> [W]e talked about the standard charges. The false in one, false in all will be charged. Prior inconsistent statement of witnesses, credibility, prior conviction of a witness and those two last charges, statements of credibility and prior conviction of witness refer to Miss Hix. Stipulation will be in there. The expert testimony charge regarding the medical examiner and the DNA expert. The statements of defendant referring to the oral statements of defendant, that charge that was read during the witness' testimony to Miss Childers and Miss Bracy. They will be referred to in that charge as well. <u>Flight</u>. Defendant's election not to testify. So the charge is pretty much in the position that it will be when the jury gets it at this point in time in the draft I provided to counsel except for the identification charge which needs some tweaking. I'll have that to you very shortly and you can review that and let me know whether or not there are any issues.
>
> [(Emphasis added).]

After summations, the court gave the jury charge, which included the Model Criminal Jury Charge on Flight.[5] Defendant did not object to any aspect of the charge. The jury returned a verdict of guilty.

---

[5] <u>Model Jury Charges (Criminal)</u>, "Resisting Arrest – Flight Alleged (N.J.S.A. 2C:29-2(a))" (rev. May 7, 2007).

10

At sentencing, the court reviewed defendant's criminal history,[6] and found defendant eligible for an extended term sentence.

The court addressed the aggravating and mitigating factors required for sentencing pursuant to N.J.S.A. 2C:44-1. The court found aggravating factor three applied because defendant was adjudicated as a juvenile three times and he had an adult criminal history. The court found aggravating factor six applied because of defendant's previous parole violation, and the seriousness of the crime. The court found the record supported application of aggravating factor nine, general deterrence. Finally, the court found aggravating factor fourteen applied, finding that the killing of Ms. Johnson was an act of domestic violence and that defendant committed it in the presence of their infant child.

Defendant argued for a non-statutory mitigating factor. He worked at a local restaurant and had risen to a management position. The court rejected the argument because he had only worked for a short period of time prior to the

---

[6] Defendant was thirty-three at the time of this murder. In April 2003, defendant was convicted of unlawful possession of an imitation firearm. In August 2003, defendant was sentenced for three crimes: third-degree theft, third-degree eluding, and third-degree burglary. On April 9, 2007, defendant was convicted of second-degree eluding and two counts of third-degree assault. On November 30, 2007, defendant was convicted of second-degree robbery.

A-1055-18

murder.[7]  The defense argued mitigating factor eleven, hardship to himself or his dependents,[8] which the court also rejected.  The court found aggravating factors three, six, nine and fourteen substantially outweighed what the court determined to be non-existent mitigating factors.

The court then sentenced defendant to an extended life term of seventy-five years with a parole ineligibility term of sixty-three years and eight months.

Defendant raises three issues on appeal:

POINT I:

ALOMAS' CONVICTION SHOULD BE REVERSED
BECAUSE THE CONVICTION IS THE RESULT OF
AN OUT OF COURT IDENTIFICATION THAT WAS
SO IMPERMISSIBLY SUGGESTIVE AS TO GIVE
RISE TO A VERY SUBSTANTIAL LIKELIHOOD OF
IRREPARABLE MISIDENTIFICATION.

POINT II:

THE TRIAL COURT COMMITTED REVERSIBLE
ERROR BY FIRST INSTRUCTING THE JURY AS
TO FLIGHT BEING POSSIBLY INDICATIVE OF
CONSCIOUSNESS OF GUILT AND THEN

---

[7]  In defendant's "Letter Brief Seeking Mitigating Sentence" filed with the trial court, defendant argued for mitigating factor eleven and the non-statutory mitigation factor.  At the sentencing hearing, defendant did not argue mitigating factor eleven, but defendant has raised it on appeal.

[8]  The court found that defendant's only child was the two-month-old infant daughter he shared with Ms. Johnson.

A-1055-18

COMPOUNDED THAT INITIAL ERROR BY ISSUING AN UNCONSTITUTIONAL INSTRUCTION ON FLIGHT AS CONSCIOUSNESS OF GUILT; THIS ISSUE WAS NOT RAISED BELOW.

POINT III:

DEFENDANT'S SENTENCE IS EXCESSIVE, UNDULY PUNITIVE, AND MUST BE REDUCED.

III.

Ms. Hix's Out of Court Identification of Defendant

Our standard of review for an out-of-court-identification is "no different from our review of a trial court's findings in any non-jury case." Wright, 444 N.J. Super. at 356–57 (citing State v. Johnson, 42 N.J. 146, 161 (1964)). "The aim of the review at the outset is to determine whether the findings made could reasonably have been reached on sufficient credible evidence present in the record." Id. at 356 (quoting Johnson, 42 N.J. at 161). "Appellate review of a motion judge's factual findings in a suppression hearing is highly deferential." State v. Gonzales, 227 N.J. 77, 101 (2016) (citing State v. Hubbard, 222 N.J. 249, 262 (2015)). We will "not disturb the trial court's findings merely because 'it might have reached a different conclusion were it the trial tribunal' or because 'the trial court decided all evidence or inference conflicts in favor of one side' in

a close case." State v. Elders, 192 N.J. 224, 244 (2007) (citing Johnson, 42 N.J. at 162).

"The Due Process Clause of the Fourteenth Amendment prohibits the admission of an unreliable out-of-court identification, which resulted from impermissibly suggestive procedures." State v. Smith, 436 N.J. Super. 556, 564 (App. Div. 2014) (citing Manson v. Brathwaite, 432 U.S. 98, 106 (1977)). Eyewitness evidence is inherently suspect, but it is equally recognized that an eyewitness's identification may be the most crucial evidence. Ibid. (quoting State v. Madison, 109 N.J. 223, 232 (1988)). "[W]hen a defendant presents evidence that an identification was made under highly suggestive circumstances that could lead to a mistaken identification, trial judges should conduct a preliminary hearing, upon request, to determine the admissibility of the identification evidence." State v. Chen, 208 N.J. 307, 311 (2011).

Four elements must be met by defendant before the trial court may grant a Wade/Henderson hearing to determine the reliability of an identification. "First, a defendant has the initial burden of showing some evidence of suggestiveness that could lead to a mistaken identification." Henderson, 208 N.J. at 288. This "must be tied to a system—and not an estimator—variable." Id. at 288-89. Second, the State must "offer proof to show that the proffered

eyewitness identification is reliable—accounting for system and estimator variables . . . ." Id. at 289. "Third, the ultimate burden remains on the defendant to prove a very substantial likelihood of irreparable misidentification." Ibid. (citing Brathwaite, 432 U.S. at 116). To do so, a defendant can cross-examine eyewitnesses and police officials and present witnesses and other relevant evidence linked to system and estimator variables. Ibid. "Fourth, if after weighing the evidence presented a court finds from the totality of the circumstances that defendant has demonstrated a very substantial likelihood of irreparable misidentification, the court should suppress the identification evidence." Ibid.

We employ "system variables" to determine if there is suggestiveness. Ibid. If the defendant "offers some evidence of suggestiveness", then the court should conduct a Wade/Henderson hearing. Id. at 291. If the court finds proof of suggestiveness, then it should consider estimator variables to evaluate the "overall reliability of an identification and determine its admissibility . . . ." Id. at 291.

Defendant contends Ms. Hix's identification was "extraordinarily suggestive" and that the State failed to prove it was reliable. As a result,

15

defendant argues the out-of-court identification was improperly before the jury. We disagree.

After listening to witnesses' testimony and considering the <u>Henderson</u> factors, the court found that Ms. Hix's identification was reliable because she knew defendant by sight, by the way he was walking, from his head structure, the fact that it was unusual to see him at that time of morning, and because she knew defendant and her identification was based on that knowledge. Although the court found that the police's procedures were impermissibly suggestive, it ultimately concluded that defendant did not meet his burden to show the identification had a substantial likelihood of misidentification.

Our review of this matter is "highly deferential" to the trial court's findings. <u>Gonzales</u>, 227 N.J. at 101 (citing <u>Hubbard</u>, 222 N.J. at 262). Our purpose on appeal is to determine whether "findings made could reasonably have been reached on sufficient credible evidence present in the record." <u>Wright</u>, 444 N.J. Super. at 356 (quoting <u>Johnson</u>, 42 N.J. at 161). The ample record in this case reveals sufficient credible evidence to support the trial court's conclusion that Ms. Hix's photo identification of defendant was reliable. The <u>Wade/Henderson</u> motion was properly denied by the trial court.

Flight Jury Charge

"[W]here a defendant fails to object contemporaneously to a jury charge, a plain error standard applies." State v. Nero, 195 N.J. 397, 407 (2008) (citing State v. Chapland, 187 N.J. 275, 288-89 (2006)). "[P]lain error requires demonstration of 'legal impropriety in the charge prejudicially affecting the substantial rights of the defendant and sufficiently grievous to justify notice by the reviewing court and to convince the court that of itself the error possessed a clear capacity to bring about an unjust result.'" Ibid. (quoting Chapland, 187 N.J. at 288-89). Further, the error must be viewed in totality of the entire charge, not in isolation. Ibid. (quoting Chapland, 187 N.J. at 288-89); see also State v. Wilbely, 63 N.J. 420, 422 (1973) (citing State v. Council, 49 N.J. 341 (1967)). In addition, any finding of plain error depends on an evaluation of the overall strength of the State's case. Nero, 195 N.J. at 407 (quoting Chapland, 187 N.J. at 288-89).

Moreover, trial errors that "[are] induced, encouraged or acquiesced in or consented to by defense counsel ordinarily are not a basis for reversal on appeal." State v. A.R., 213 N.J. 542, 561 (2013) (quoting State v. Corsaro, 107 N.J. 339, 345 (1987)) (internal quotation marks omitted). This means "if a party has 'invited' the error, he is barred from raising an objection for the first time on

appeal." Ibid. (citing N.J. Div. of Youth & Fam. Servs. v. M.C. III, 201 N.J. 328, 342 (2010)).

We apply the plain error standard because, as defendant acknowledges in his brief, he did not object to the jury charge. Quite frankly, defendant had two chances to object to the charge: first, when the court gave each party the entire jury charge to review in preparation for summations and jury instructions, and second, when the court explicitly asked the parties for objections to the charge.

Defendant has not met the burden required under Nero to justify appellate review of this newly raised issue. We can find no legal impropriety whatsoever in the model flight charge given to the jury. The record supports the trial court's incorporation of the flight charge for consideration by the finder of fact. To the extent that there is any error here, and we find none, it was consented to by the defense. A.R., 213 N.J. at 561. Nothing about this charge "prejudicially affect[ed] the substantial rights of the defendant and [was] sufficiently grievous to justify notice by the reviewing court and to convince the court that of itself the error possessed a clear capacity to bring about an unjust result." Nero, 195 N.J. at 407. The flight charge issue is not properly before us for review.

The Sentence

An abuse of discretion standard applies in the review of a sentencing court's decision to impose an extended-term sentence. State v. Pierce, 188 N.J. 155, 166 n.4 (2006). A sentencing court must first "determine whether the minimum statutory eligibility requirements for an extended-term sentence are present." Id. at 169; see also State v. Tillery, 238 N.J. 293, 323 (2019). "[O]nce the court finds that those statutory eligibility requirements are met, the maximum sentence to which defendant may be subject is the top of the extended-term [sentencing] range." Pierce, 188 N.J. at 169; see also Tillery, 238 N.J. at 324. "On appellate review, [we] apply an abuse of discretion standard to the sentencing court's explanation for its sentencing decision within the entire [sentencing] range." Pierce, 188 N.J. 169-70.

A sentencing court must address three questions when reviewing a sentence: (1) "whether the correct sentence guidelines have been followed"; (2) "whether there is substantial evidence in the record to support the findings of fact upon which the sentencing court based the application of those guidelines"; and (3) "whether, in applying those guidelines to the relevant facts, the trial court clearly erred by reaching a conclusion that could not have reasonably been made upon a weighing of the relevant factors." State v. Martelli, 201 N.J. Super.

378, 384–85 (App. Div. 1985) (quoting State v. Roth, 95 N.J. 334, 365–66 (1984)).

The relevant sentencing guidelines are found in N.J.S.A. 2C:44-3, N.J.S.A. 2C:43-7(a)(6), and N.J.S.A. 2C:43-7.2. N.J.S.A. 2C:44-3 permits a sentencing court to, "upon application of the prosecuting attorney, sentence a person who has been convicted of a crime of the first, second or third degree to an extended term of imprisonment if it finds" that defendant is a persistent offender. N.J.S.A. 2C:44-3.

A persistent offender is

> a person who at the time of the commission of the crime is 21 years of age or over, who has been previously convicted on at least two separate occasions of two crimes, committed at different times, when he was at least 18 years of age, if the latest in time of these crimes or the date of the defendant's last release from confinement, whichever is later, is within 10 years of the date of the crime for which the defendant is being sentenced.
>
> [N.J.S.A. 2C:44-3.]

For a sentence pursuant to a murder conviction, the statute calls "for a specific term of years which shall be fixed by the court between 35 years and life imprisonment, of which the defendant shall serve 35 years before being eligible for parole." N.J.S.A. 2C:43-7(a)(6). Further, the sentencing court on a

murder conviction is statutorily required to fix a minimum term of eighty-five percent of the sentence imposed, during which the defendant shall not be eligible for parole.  N.J.S.A. 2C:43-7.2(d)(1).

Defendant argues his life term was excessive, unduly punitive and must be reduced.  The trial court first reviewed defendant's past criminal history and found the minimum statutory eligibility requirements for an extended term sentence were present.  The court found defendant qualified as a persistent offender.  Defendant has not contested this finding on appeal.  The court followed the correct sentencing guidelines.  A thorough review of the sentencing transcript reveals the trial court used the substantial credible evidence in the record to find facts with which it performed its aggravating and mitigating factor analysis.[9]  Among other facts the trial court found at sentencing, was that the victim, Ms. Johnson, was found with her hands and feet bound by duct tape, with a plastic bag over her head and an electrical cord near her neck.  The court

---

[9]  The statutory aggravating factors considered by the trial court were: (3) the risk that the defendant will commit another offense, (6) the extent of the defendant's prior criminal record and the seriousness of the offenses of which [the defendant] has been convicted, (9) the need for deterring the defendant and others from violating the law, and (14) the offense involved an act of domestic violence committed in the presence of a child under 16 years of age.  N.J.S.A. 2C:44-1.  The court found no mitigating factors applied.

A-1055-18

observed that the cause of death in evidence was asphyxiation as well as manual strangulation.

We find the trial court's sentence was a "conclusion that could have reasonably been made upon a weighing of the relevant factors." Martelli, 201 N.J. Super. at 384–85. We find no abuse of discretion in the trial court's sentence of defendant to an extended life term of seventy-five years, nor do we find any error in the imposition of the statutorily required eighty-five percent term of parole ineligibility pursuant to N.J.S.A. 2C:43-7.2(d)(1).

Any argument not addressed here lacks sufficient merit to warrant discussion in a written opinion. R. 2:11-3(e)(2).

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-1055-18