**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-4176-17T4

STATE OF NEW JERSEY,

    Plaintiff-Respondent,

v.

DAEVON DAVIS, a/k/a
DAEVON N. DAVIS,

    Defendant-Appellant.

_____

Argued telephonically June 1, 2020 –
Decided July 15, 2020

Before Judges Rothstadt, Moynihan and Mitterhoff.

On appeal from the Superior Court of New Jersey, Law Division, Essex County, Indictment No. 16-03-0733.

Laura M. Garcia argued the cause for appellant (Joseph E. Krakora, Public Defender, attorney; Laura M. Garcia, Designated Counsel, on the briefs).

Steven Cuttonaro, Deputy Attorney General, argued the cause for respondent (Gurbir S. Grewal, Attorney General, attorney; Steven Cuttonaro, of counsel and on the brief).

PER CURIAM

Defendant Daevon Davis appeals from his conviction after jury trial of: first-degree conspiracy to commit murder, N.J.S.A. 2C:5-2 and N.J.S.A. 2C:11-3(a)(1),(2) (count one); first-degree murder, N.J.S.A. 2C:11-3(a)(1),(2) (count two); second-degree unlawful possession of a weapon, N.J.S.A. 2C:39-5(b) (count three); and second-degree possession of a weapon for an unlawful purpose, N.J.S.A. 2C:39-4(a) (count four), in connection with the shooting death of Christopher Graham on the one-hundred block of Isabella Avenue, and defendant's concomitant aggregate sentence of life imprisonment, subject to the No Early Release Act (NERA), N.J.S.A. 2C:43-7.2(a). On appeal, he argues:

> [POINT I]
>
> [DEFENDANT'S] CONVICTION MUST BE REVERSED BECAUSE THE TRIAL COURT ERRED IN ADMITTING THE FINGERPRINT EVIDENCE WHERE DETECTIVE RICCI'S ANALYSIS WAS PREJUDICIALLY FLAWED AND NOT BASED ON FACTS IN THE RECORD.
>
> [POINT II]
>
> THE TRIAL COURT ERRED IN ADMITTING [AN EYEWITNESS'S (THE WITNESS'S)] IDENTIFICATION OF [DEFENDANT] WHICH RESULTED FROM SUGGESTIVE CONDUCT BY BOTH THE STATE AND A PRIVATE ACTOR WITHOUT FIRST CONDUCTING AN EVIDENTIARY HEARING.

2

A.    [The witness's] Identification was the Irreparable Product of an Improperly Suggestive Photo Array Procedure.

B.    [The witness's] Identification was the Irreparable Product of Suggestive Conduct by an Unidentified, Unnamed Third Party Who Was Not Subject to Cross-Examination as well as [the witness's] Use of Instagram to Further Confirm her Identification.

[POINT III]

THE STATE'S FAILURE TO PROVIDE ADMISSIBLE EVIDENCE OF [DEFENDANT'S] INVOLVEMENT IN THE SHOOTING RENDERS THE HANDGUN EVIDENCE IRRELEVANT AND WHOLLY INADMISSIBLE, REQUIRING REVERSAL OF [DEFENDANT'S] CONVICTION FOR UNLAWFUL POSSESSION OF A WEAPON.

[POINT IV]

THE CUMULATIVE EFFECT OF THE ABOVE ERRORS DEPRIVED [DEFENDANT] OF DUE PROCESS AND A FAIR TRIAL, REQUIRING REVERSAL.

[POINT V]

THE TRIAL COURT'S SENTENCE WAS EXCESSIVE.

Unpersuaded, we affirm.

## I.

We consider the facts found in the trial record. In the investigation that followed the police response to a 911 call on July 13, 2015, reporting that two individuals each wearing gray hooded sweatshirts, blue jeans and blue bandanas around their faces shot the victim several times then ran in different directions, police recovered surveillance-camera video from a residence on the same block. The multi-channel video captured one of the fleeing suspects, wearing a gray hooded sweatshirt, holding what appeared to be a handgun as he ran through a common driveway. As he ran, he placed his left hand on the windshield of a vehicle and continued through yards onto Vermont Avenue.

That video led Essex County Prosecutor's Office Detective Frank Ricci—who was qualified at trial as an expert in fingerprint analysis—to process "the front windshield on the passenger side within arm[']s reach" for fingerprints. Of the four latent prints lifted by the detective, three were screened through a fingerprint database, and the detective later compared the three lifts against defendant's known fingerprints. He opined two latent prints lifted from the vehicle matched those of defendant's left little finger and left index finger.

Although defendant did not object to the admission of Ricci's expert testimony at trial, he now argues the admission of that testimony was plain error

4

because it "constituted an inadmissible net opinion" that was a "speculative, cursory, and unreliable expert conclusion" that had "no support in the record, failed to establish the factual bases or methodology, and should have been excluded." That argument is belied by the record.

Ricci testified generally about fingerprints, which he explained are "unique skin [called] friction ridge skin" transferred to another surface; and about their characteristics—loops, whorls and arches—that are unique to each person. He later explained other points—ridge endings, bifurcations and deltas—to the jury. He also described his method for lifting prints and the preliminary screening performed before his comparison. Defendant takes no issue with that portion of Ricci's testimony.

Ricci then explained how he placed two of the latent prints, preserved on L-1 and L-3, next to the known prints from defendant's fingerprint card and, using a magnifying device known as a loop and alternative light sources called pointers to help identify points of interest, did a side-by-side analysis of the fingerprints.

Using two colored diagrams of defendant's known fingerprints and the latent prints, the detective explained to the jury:

> So as I testified earlier about ridge lines, these are
> ridge lines, and I indicated that deviations of the ridge

lines are the minutia[e] points where the ridge lines separate . . . split or come together. The deviations are – are the points of identification, so what we do to do an identification is that we would look at the latent print lift and find – follow the ridge lines and find the deviations.

Detective Ricci testified further that, after following the ridge lines in LP-1 and LP-3, he then compared the deviations, i.e, points of identification, in those prints to defendant's known fingerprint impressions. He explained his process: "you would do a comparison [by] . . . find[ing] the deviation and then you would count the lines between that deviation and the next deviation, and it [has] to be an exact replica in order to make an identification. If you find one inconsistent deviation" the comparison would be terminated because "it would not be that person" against whose known prints the latent prints were compared. Later in his testimony, he elaborated:

> I identified the minutia[e] point which is the actual point, and then I count ridge lines to the next visible minutia[e] point, and then if the numbers come out correct, it has to be exactly reflective to the identifiable print. It would be exactly the same. If there's an extra line in here that's not here, then it would disqualify that person. So every point that's identified here must matchup with the other known print.

If one minutiae point did not match, "the print would be excluded."

A-4176-17T4

On one diagram, Ricci highlighted eleven minutiae points on both LP-1 and the known print for defendant's left little finger which reflected eleven matching points of identification that he found by comparing the two prints. On the other diagram, he highlighted nine points on both LP-3 and the known print of defendant's left index finger that corresponded to the matching points of identification between the two prints. He fully explained the color-coded diagrams and how he reached his conclusion that both prints matched those of defendant by counting the number of ridge lines between the minutiae points in each set of prints.

Ricci's comprehensive analysis of the latent prints against defendant's known prints provided the factual basis for his opinion. See Townsend v. Pierre, 221 N.J. 36, 53-54 (2015) (Under the net opinion rule, "an expert's conclusions that are not supported by factual evidence or other data" are barred from admission into evidence at trial. (quoting Polzo v. County of Essex, 196 N.J. 569, 583 (2008))). Ricci's conclusion was not "based merely on unfounded speculation and unquantified possibilities." Id. at 55 (quoting Grzanka v. Pfeifer, 301 N.J. Super. 563, 580 (App. Div. 1997)). He provided "'the why and wherefore' that support[ed his] opinion, 'rather than a mere conclusion.'" Id. at

54 (quoting Borough of Saddle River v. 66 E. Allendale, LLC, 216 N.J. 115, 144 (2013)).

"[F]ingerprint analysis . . . involves an expert [visually] identifying points of comparison between a known and unknown print." State v. Fortin, 189 N.J. 579, 602 n.12 (2007). The science and statistical data behind Ricci's mode of analysis has long been recognized by our courts. See State v. Cary, 49 N.J. 343, 355 (1967) ("New Jersey was an early state in the recognition of fingerprint evidence, State v. Cerciello, 86 N.J.L. 309, 313-14 (E. & A. 1914), a type of investigative aid which now possesses unquestioned value."). It is quite apparent Ricci did not render an opinion based on a subjective standard wholly personal to him. See Pomerantz Paper Corp. v. New Cmty. Corp., 207 N.J. 344, 373 (2011) ("[I]f an expert cannot offer objective support for his or her opinions, but testifies only to a view about a standard that is 'personal,' it fails because it is a mere net opinion."). Ricci's detailed and illustrated testimony established that his was not a net opinion.

We reject defendant's argument that the discrepancy in the location of the lifted latent prints rendered Ricci's opinion irrelevant. Counsel for defendant cross-examined Ricci about his prior testimony that he processed only the upper portion of the passenger-side windshield. Counsel highlighted in summation

that both Ricci and an Essex County Prosecutor's Office lieutenant testified that the latent prints were lifted from the upper portion of the windshield. She argued, however, that video shows the fleeing suspect touching only the lower portion of the windshield, and the fingerprint evidence presented by the State was "absolutely meaningless."

Although defendant rightly challenging the meaning of the evidence, whether the latent prints were lifted from the upper or lower portion of the windshield did not scotch the admissibility of Ricci's opinion. Ricci also testified that he fingerprinted the entire windshield and that "[t]he prints were developed in the upper portion, the middle – the top half of the windshield"; and that he processed "the front windshield on the passenger side within arm[']s reach."

The jury was left to resolve the conflicting evidence and determine if the prints lifted from the windshield were left by defendant. See Rosenberg v. Tavorath, 352 N.J. Super. 385, 399 (App. Div. 2002) (It is "the function of the jury to determine the credibility and probative value of the expert's testimony."). Nonetheless, Ricci's opinion was relevant evidence. See State v. Santamaria, 236 N.J. 390, 405 (2019) ("N.J.R.E. 401 defines 'relevant evidence' as 'evidence having a tendency in reason to prove or disprove any fact of consequence to the

determination of the action.'  Relevant evidence 'need not be dispositive or even strongly probative in order to clear the relevancy bar.'" (quoting State v. Cole, 229 N.J. 430, 447 (2017))).

We determine defendant's remaining challenges to the fingerprint evidence, including that related to defects in any expert report, are without sufficient merit to warrant discussion here.  R. 2:11-3(e)(2).  We note only that there is evidence that Ricci "generated a fingerprint . . . examination report" and was cross-examined about the contents of his report.  The appellate record does not contain a report, and defendant did not seek to bar Ricci's testimony or seek other appropriate relief because his report did not comply with Rule 3:13-3(b)(1)(C) and (I).

We see no error, much less plain error, in the admission of the State's fingerprint evidence.  R. 2:10-2.

## II.

The State introduced the out-of-court and in-court identifications of defendant made by a witness who testified about her encounter with him on July 13, 2015, after she heard "pop noises" that she was convinced were gunshots.  Defendant did not move to suppress the witness's identification.  He now argues her out-of-court identification at a photo array conducted by an Essex County

Prosecutor's Office investigator on the day of the homicide was tainted by what

he terms in his merits brief as

> three critical factors: (1) the State's suggestive behavior during the photo array; (2) [the witness's] own review of what she believed was [defendant's] Instagram account; and (3) the identification of [defendant] over the phone, based on [the witness's] description, by an unnamed individual who was incarcerated at the time the crime occurred.

Defendant claims the trial court's failure to hold an evidentiary hearing, required

by the "suggestive circumstances," was plain error under Rule 2:10-2, requiring

"reversal and a remand for an evidentiary hearing to determine the reliability of

[the] identification."

In its seminal eyewitness identification decision, our Supreme Court

introduced a revised framework to evaluate identification evidence:

> First, to obtain a pretrial hearing, a defendant has the initial burden of showing some evidence of suggestiveness that could lead to a mistaken identification. See State v. Rodriquez, 264 N.J. Super. [261, 269 (1993), aff'd o.b., 135 N.J. 3 (1994)]; State v. Ortiz, 203 N.J. Super. [518, 522 (1985)]; cf. State v. Michaels, 136 N.J. 299, 320 (1994) (using same standard to trigger pretrial hearing to determine if child-victim's statements resulted from suggestive or coercive interview techniques). That evidence, in general, must be tied to a system—and not an estimator—variable. But see [State v. Chen, 208 N.J. 307 (2011)] (extending right to hearing for suggestive conduct by private actors).

11

[State v. Henderson, 208 N.J. 208, 288-89 (2011), modified by State v. Anthony, 237 N.J. 213 (2019).]

The Court instructed that a trial court "should conduct a [pretrial hearing, commonly known as] a Wade[1] hearing only if defendant offer some evidence of suggestiveness," id. at 290, based only on a non-exhaustive list of "system variables," which it delineated:

> 1. Blind Administration. Was the lineup procedure performed double-blind? If double-blind testing was impractical, did the police use a technique like the "envelope method" described above, to ensure that the administrator had no knowledge of where the suspect appeared in the photo array or lineup?
>
> 2. Pre-identification Instructions. Did the administrator provide neutral, pre-identification instructions warning that the suspect may not be present in the lineup and that the witness should not feel compelled to make an identification?
>
> 3. Lineup Construction. Did the array or lineup contain only one suspect embedded among at least five innocent fillers? Did the suspect stand out from other members of the lineup?
>
> 4. Feedback. Did the witness receive any information or feedback, about the suspect or the crime, before, during, or after the identification procedure?
>
> 5. Recording Confidence. Did the administrator record the witness' statement of confidence immediately after

---

[1] United States v. Wade, 388 U.S. 218 (1967).

A-4176-17T4

the identification, before the possibility of any confirmatory feedback?

6. Multiple Viewings. Did the witness view the suspect more than once as part of multiple identification procedures? Did police use the same fillers more than once?

7. Showups. Did the police perform a showup more than two hours after an event? Did the police warn the witness that the suspect may not be the perpetrator and that the witness should not feel compelled to make an identification?

8. Private Actors. Did law enforcement elicit from the eyewitness whether he or she had spoken with anyone about the identification and, if so, what was discussed?

9. Other Identifications Made. Did the eyewitness initially make no choice or choose a different suspect or filler?

[Id. at 289-90.]

In cases where a private actor's suggestive behavior is implicated, the Court reached a similar conclusion after a nuanced analysis. Chen, 208 N.J. at 311. While ruling defendant's due process rights were not in issue because government action was not involved in the identification, the Court ruled "although no Wade hearing was necessary, that hardly ends the inquiry. We must consider the admission of eyewitness identifications tainted by private suggestive procedures in light of the rules of evidence and the trial courts'

gatekeeping function." Id. at 318. Under those standards, the Court modified the Henderson requirements for obtaining a Wade hearing and, in private-actor cases, required "a higher, initial threshold of suggestiveness to trigger a hearing, namely, some evidence of highly suggestive circumstances as opposed to simply suggestive conduct." Id. at 327.

Those polestars guide our review of the facts adduced at trial that bear on the suggestiveness of the photo array identification.

Shortly after hearing the "pop noise[s]" the witness saw two individuals wearing gray hooded sweatshirts and blue jeans run from Vermont Avenue and enter a parked vehicle. Although both had the sweatshirt hoods drawn tight concealing their faces, the individual who entered the back seat pulled his hood back, allowing the witness to see his face.

The witness immediately recognized defendant "[b]ecause he[] [was] someone that [she had] seen around the neighborhood a plethora of times." She explained that by "around the neighborhood" she meant:

> South Orange Avenue, Isabella Avenue, Sunset Avenue. There's a Dunkin Donuts on West End – there. There's a laundry mat on South Orange Avenue – like it would be between Vermont and Isabella – in the laundry mat. There's a parking lot next to the laundry mat where the bust stop is – there.

There's a Home Liquors across the street – there.
There's a corner store – there. There's a Chicken Shack
across from the corner store – there. I mean, all over.

The witness estimated she had seen defendant "[m]ore than a hundred" times over more than five years.

Although she did not know defendant's given name or surname, she knew his street name to be "Young Snatch." She also "followed" defendant on his Instagram[2] account under the user names "4eva_sleezy" and then "Ben_bun_bet." She showed both Instagram accounts to a police sergeant who responded to her house after she called police. The witness testified she was able to "instantly . . . pull up [both of defendant's] Instagram accounts" during the initial interview and provided police with the account names.

At the Prosecutor's Office on the day of the homicide, before the witness gave a statement to detectives and participated in the photo array, she received a telephone call from an incarcerated individual who was neither identified nor testified at trial. The witness described to the caller the individual she saw by giving his street name and his physical appearance. The caller told the witness he thought the individual's name was either Daevon or Devon.

---

[2] The witness described Instagram as "a social site. . . . used to post videos and post photos."

A-4176-17T4

The witness then gave a statement to detectives; she did not describe defendant as having dreadlocks, dark skin or facial hair. The witness said she did not provide the description because there "was no need because [she] had his Instagram."

The photo array was compiled by a detective who, after receiving information from the sergeant about defendant's Instagram accounts, opened the account, saw defendant's photo and included a non-Instagram photo of defendant in the array with five fillers. That array was shown sequentially to the witness by a blind administrator, an investigator without knowledge of the case including the identity of any suspect.

In fact, as part of the instructions given to the witness prior to being shown the photographs, the investigator told her "[i]f you select a photograph, please do not ask me whether I agree with or support your selection. I do not – know whether – whom the suspect is, if he or she are present in the lineup, or what photograph he or she may be [in] if present," and that it was her "choice alone that counts." The additional instructions included:

> In a moment I will show you a number of photographs one at a time. You may take as much time as you need to look at each one. You should not conclude that the person who committed the crime is in the group merely because a group of photographs are being shown to you. The person who committed the

crime may or may not be in the group and the mere display of the photographs is not meant to suggest that the police believe that the person who committed the crime is in one of the photographs. You do not have to select any photograph. There is no significance to the order in which the photographs are displayed.

Even if you select a photograph, all the photographs will still be show to you. However, tell me immediately if you recognize anyone in one of the photographs.

The witness viewed two photographs, and said, "[n]o," to each, signifying neither was the person she saw in the vehicle. She immediately selected the third photograph—defendant's—when she saw it. The investigator asked her, "Yes?" The witness responded, "Yes." The investigator told her, "Okay, put that one aside." The investigator showed the remaining fillers to the witness; she again said, "[n]o," to each. She initialed and dated the photographs she did not select; she signed and dated the photograph she did.

Defendant does not contend: the array was not conducted by a blind administrator; the witness was not given "neutral, pre-identification instructions warning that the suspect may not be present in the lineup and that the witness should not feel compelled to make an identification"; defendant's photograph was physically different from the fillers; or that the witness viewed any photo more than once. Henderson, 208 N.J. at 290.

He does argue the investigator's verification of the witness's response of "[y]es" when shown photograph number three, and his request to set that photograph aside constituted confirmatory feedback. We see no merit in that argument. The investigator did not know if defendant was the suspect. By merely confirming the witness's response and setting aside the photograph so she could later sign it, he was preventing any confusion or misunderstanding during the identification procedure. Those measures did not confirm the witness's choice. See id. at 253 ("Confirmatory or post-identification feedback . . . . occurs when police signal to eyewitnesses that they correctly identified the suspect."). Further, contrary to defendant's merits-brief contention, the request did not signal that the identification procedure was complete. Indeed, the procedure continued with the showing of the remaining photographs in accordance with the investigator's preliminary instructions.

Although the record does not reflect the investigator filled out the post-identification forms that record the percentage of the witness's assuredness, in asking the witness how she recognized the person in photograph number three, he elicited: "I know[] him from the neighborhood. He – he [is] around my neighborhood. And then today I noticed him running from Vermont and getting in the car after I heard shots fired." The circumstances, including the witness's

immediate response as shown on the recording of the procedure, and her familiarity with defendant evidenced by her many prior viewings in the neighborhood and her knowledge of his Instagram accounts and street name, indicate a confidence level. Defendant's trial counsel ably explored the basis for the witness's identification, probing each source of the witness's basis for identifying defendant.

We determine defendant's argument that the filler photographs were suggestive because they depicted individuals who did not live in the witness's neighborhood where she had previously seen defendant is without sufficient merit to warrant discussion. R. 2:11-3(e)(2). While the witness did not recognize any of the individuals depicted in the fillers as being from her neighborhood, there is no evidence they were not. Moreover, neither Henderson nor any other case require that fillers be of persons from a geographic area. The fillers must not be suggestive; that is, they must look like the photograph of the suspect. Henderson, 208 N.J. at 293 (including, as a factor in determining suggestiveness, if "fillers . . . resemble the suspect"); see also State v. Herrera, 187 N.J. 493, 516 (2006) ("In composing a photo or live lineup, the person administering the identification procedure should ensure that the lineup is comprised in such a manner that the suspect does not unduly stand out.

19

However, complete uniformity of features is not required." (quoting Office of the Attorney Gen., N.J. Dep't of Law and Pub. Safety, Attorney General Guidelines for Preparing and Conducting Photo and Live Lineup Identification Procedures 1 (2001) (Guidelines))). Defendant does not contend the fillers did not resemble defendant.

Our review leads us to conclude defendant did not show some evidence of suggestiveness sufficient to warrant a Wade hearing, and we reject his call for a remand.

Turning to defendant's argument that the caller who provided the witness with defendant's first name tainted the identification procedure, we do not find his analogy to Chen apposite. The victim in Chen did not know her attacker, 208 N.J. at 312, and told police she "didn't see her [assailant's] face except for a second when she turned," id. at 313. She sketched her assailant and showed it to her husband who thought it resembled his ex-girlfriend. Ibid. He opened the ex-girlfriend's website and showed the victim five to ten pictures of defendant without including any innocent fillers. Id. at 313, 329. After seeing one particular photo off of the website, the victim "just jumped" and was "ninety percent positive" that the woman depicted in one of the photographs attacked her. Id. at 313. The victim's sister drew eyeglasses on the photograph at which

point the victim positively identified her attacker.  Ibid.  Those circumstances, deemed highly suggestive by the Court, required a remand for an evidentiary hearing.  Id. at 329.

Here, in contrast, the witness knew defendant from the neighborhood, seeing him many times over the years and following him on Instagram.  She knew his street names and both of his Instagram accounts.  The only information provided by the caller, after the witness provided him with defendant's street name and physical description, was two variations of a given name.  In his merits brief, defendant attempts to relate Chen's facts because the witness viewed defendant's Instagram account.  Neither the caller nor any other third-party, however, prompted the witness to view defendant's Instagram account, of which she had personal knowledge.

We do not discern that information met the "higher, initial threshold of suggestiveness [necessary] to trigger a hearing, namely, some evidence of highly suggestive circumstances as opposed to simply suggestive conduct."  Id. at 327.  Defendant's first name was not mentioned or shown during the photo array; there is no evidence it played any role in the witness's identification.

We, therefore, reject defendant's argument that "the trial court's failure to require an evidentiary hearing to determine the reliability and admissibility of

[the witness's] identification was clearly capable of producing an unjust result," amounting to plain error under Rule 2:10-2. Defendant did not meet the threshold showing of suggestiveness required under Henderson and Chen to warrant an evidentiary hearing.

III.

Though the surveillance video that showed that the suspect fleeing through the driveway was carrying a handgun, police did not immediately recover a murder weapon. More than six months after Graham was shot and killed, police executed a search warrant in an unrelated case and recovered a handgun that a ballistics expert testified was that from which shell casings and projectiles taken as evidence from the crime scene on Isabella Avenue were fired.

Defendant claims there was insufficient evidence linking him to that handgun. Specifically, he argues without the fingerprint and identification evidence, evidence that handgun matched that used in the Graham homicide was irrelevant and inadmissible; his conviction for unlawful possession of a weapon should be reversed.

As determined, the fingerprint and identification evidence were properly admitted. The jury was instructed they could consider in their deliberations

direct evidence that directly proves a fact, and circumstantial evidence which provides "a fact from which an inference of the existence of another fact may be drawn. An inference is a deduction of fact . . . that may logically and reasonably be drawn from another fact or group of facts established by the evidence." Model Jury Charges (Criminal), "Circumstantial Evidence" (rev. Jan. 11, 1993).

Accordingly, the 911 call describing the shooters each wearing gray hooded sweatshirts, blue jeans and blue bandanas; surveillance video showing two individuals with firearms and wearing gray hooded sweatshirts on that July afternoon running on Isabella Avenue after the shooting; more video showing the fleeing suspect wearing a gray hooded sweatshirt carrying an apparent handgun in the driveway where the car was parked on which defendant's fingerprints were left; three gray hooded sweatshirts recovered from defendant's residence by police executing a search warrant a week after the homicide; the witness's identification of defendant and her description of the clothing he was wearing when she first saw him on Vermont Avenue, the street to which the suspect ran after exiting the driveway; and the ballistics evidence linking the casings and projectiles to Graham's homicide provided circumstantial, if not direct, evidence that defendant possessed the handgun on the day Graham was

killed.[3]  There was ample evidence of that crime to sustain the jury's finding on that charge.  See State v. Brown, 80 N.J. 587, 592 (1979).

IV.

Defendant's argument that the cumulative effect of the trial errors deprived defendant of a fair trial is without sufficient merit to warrant any discussion.  R. 2:11-3(e)(2).  We discern no errors.

V.

In sentencing defendant, the trial court found aggravating factor three, the risk that defendant would commit another crime, N.J.S.A. 2C:44-1(a)(3), and gave it high consideration; aggravating factor six, the extent of defendant's criminal history and seriousness of the offenses which he was previously convicted, N.J.S.A. 2C:44-1(a)(6), and gave it moderate consideration; aggravating factor nine, the need to deter defendant and other individuals from violating the law, N.J.S.A. 2C:44-1(a)(9), and gave it high consideration; and mitigating factor eleven, defendant's imprisonment would cause excessive hardship to himself or his dependents, N.J.S.A. 2C:44-1(b)(11), and afforded it low consideration.  The court found "the aggravating factors preponderate

---

[3]  Defendant stipulated that he did not possess a permit to possess the handgun, the other element of the crime other than the knowing possession of same. N.J.S.A. 2C:39-5(b)(1).

significantly over the sole mitigating factor." After merging counts one and four, the trial court sentenced defendant to life imprisonment, subject to NERA, for murder (count two) and a concurrent ten-year prison sentence with five years of parole ineligibility for unlawful possession of a handgun (count three).

Defendant argues the sentence was excessive because the court "failed to adequately apply the relevant aggravating and mitigating factors," in that "[t]he trial court's finding of aggravating factors three and six was not supported by competent credible evidence in the record[.]"

After reciting defendant's juvenile and adult criminal history, the trial court found "aggravating factor three, both [three]A and [three]B[,]" which it identified as "[t]hree[]A, the risk defendant will commit another offense," and defendant's failure to "express any remorse" that the court found "as an aggravating factor under [three]B." As to the former, the court recognized defendant's extensive criminal history, including his "six juvenile adjudications, within a six-year period with two parole violations. . . . [e]leven disorderly convictions from 2008 to 2014 with a violation of probation,[4]" and one prior indictable conviction on which defendant violated probation. As to factor three

---

[4] The presentence report indicates defendant was resentenced on December 13, 2010, for two violations of probation on separate disorderly persons convictions.

B, the court acknowledged defendant's in-court apology for the loss to the victim's family but highlighted his lack of remorse despite the surfeit of evidence that defendant planned and executed the murder, "gunn[ing] down [Graham] in the street in broad daylight." The trial court concluded there exists no evidence "to detract from the reasonable likelihood that . . . defendant will offend again."

Notwithstanding the trial court's bifurcation of the single statutory aggravating factor, it found defendant continued to commit numerous offenses despite experiencing both parole and probation supervision, as well as numerous jail terms. See State v. Dunbar, 108 N.J. 80, 96-97 (1987) (finding aggravating factor three was warranted based defendant's "lengthy juvenile record, [and] his adult record including violations of parole and probation"). Further, defendant's denial of involvement and his lack of remorse indicated that a prison sentence was necessary to deter defendant from similar conduct in the future. The trial court, therefore, properly considered defendant's lack of remorse as part of its finding regarding aggravating factor three. See generally State v. Rivers, 252 N.J. Super. 142, 153-54 (App. Div. 1991) (recognizing a defendant's lack of remorse as one of the many reasons supporting aggravating factor nine, N.J.S.A. 2C:44-1(a)(9)).

The trial court based aggravating factor six on "the extent of . . . defendant's prior record . . . and the seriousness of this event." Defendant's lengthy criminal history supported the court's determination. We disagree with defendant's contention that the trial court wrongly considered the "seriousness of [the] event" in finding this aggravating factor. The court properly considered the escalating nature of defendant's criminal history.

"[A]n appellate court should not second-guess a trial court's finding of sufficient facts to support an aggravating or mitigating factor if that finding is supported by substantial evidence in the record." State v. O'Donnell, 117 N.J. 210, 216 (1989). Under our deferential standard of review, we "must not substitute [our] judgment for that of the sentencing court," and will affirm a sentence unless:

> (1) the sentencing guidelines were violated; (2) the aggravating and mitigating factors found by the sentencing court were not based upon competent and credible evidence in the record; or (3) 'the application of the guidelines to the facts of [the] case makes the sentence clearly unreasonable so as to shock the judicial conscience.'
>
> [State v. Fuentes, 217 N.J. 57, 70 (2014) (alteration in original) (quoting State v. Roth, 95 N.J. 334, 364-65 (1984)).]

A-4176-17T4

Under that lens, we discern no reason to overturn the trial court's sentence.

Affirmed.

I hereby certify that the foregoing
is a true copy of the original on
file in my office.

CLERK OF THE APPELLATE DIVISION

A-4176-17T4