**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-4007-21

STATE OF NEW JERSEY,

     Plaintiff-Respondent,

v.

NAJEEH GREEN, a/k/a
NAJEE GREEN, NAJEE
GREENE, NAJEEH M
GREEN, and NAJEEH
AMIR GREEN,

     Defendant-Appellant.

_____

Submitted October 30, 2024 – Decided December 5, 2024

Before Judges Mayer and Rose.

On appeal from the Superior Court of New Jersey, Law Division, Essex County, Indictment No. 19-12-3588.

Jennifer N. Selletti, Public Defender, attorney for appellant (Andrew R. Burroughs, Designated Counsel, on the briefs).

Theodore N. Stephens, II, Essex County Prosecutor, attorney for respondent (Lucille M. Rosano, Deputy Attorney General, of counsel and on the brief).

PER CURIAM

Defendant Najeen Green appeals from a July 25, 2022 amended judgment of conviction for felony murder, carjacking, aggravated assault, and related weapons offenses.[1]  In the alternative, he argues the sentencing judge erred in imposing consecutive sentences for felony murder and aggravated assault.  We affirm the convictions and sentence.

I.

We recite the facts from the testimony adduced at trial.  During a May 5, 2018 crime spree in Essex County, two men in a white Jeep were implicated in the shooting of Kyon Coleman,[2] the carjacking of a black Ford Taurus belonging to Lynn Adams, and causing a collision that killed an innocent bystander, Priscilla Godoy.

A.  Carjacking and Shooting of Kyon

Around 8:00 p.m., Kyon, his wife, and their infant granddaughter were on Hayes Street in Newark.  Kyon stood outside his car and noticed a suspicious

---

[1]  On July 15, 2022, the judgment of conviction was amended to reflect the merger and dismissal of counts four and eleven.  The judgment of conviction was amended again on July 25, 2022 to reflect the correct aggregate parole ineligibility term.

[2]  Because some of the witnesses share the same surname, we use first names for easy of reference.  We intend no disrespect in doing so.

A-4007-21

man approach on foot.  The man wore a winter coat which struck Kyon as odd given the warm weather in May.  As the man approached, he lowered a ski mask over his face, pulled a gun from his pocket, and fired at Kyon, striking him three times.  Kyon was transported to the hospital having suffered significant injuries.

B. <u>Carjacking</u>

Between 9:30 and 10:00 p.m. the same day, Adams parked her black Ford Taurus outside her son's home in East Orange.  When Adams left her son's house and returned to her car, a white Jeep "zoomed" in front of her car, blocking her ability to drive away.  The Jeep's passenger, whom Adams described as a Black male, 5'11" tall, and approximately 180 pounds, "jumped" out and pointed a gun in Adams's face.  The masked man forced Adams out of the car and drove away in her car.

The Jeep then drove toward Newark. The gunman who stole the Taurus followed.  Adams and her son reported the incident to the East Orange Police Department.  Based on the information provided, the police dispatcher radioed local agencies to be on the lookout (BOLO) for a "white Jeep, box-style" and a black Ford Taurus.

A-4007-21

## C. Collision and Aftermath

Officer Paul Hamilton of the Newark Police Department heard the BOLO. About two minutes later, Hamilton saw a "box-style white Jeep Cherokee" travelling "at a high rate of speed" and "disregard[ing] the stop sign" as it drove northbound on Chadwick Avenue. Hamilton could hear "the engine revving" and "the sound of [a tire] rim on the concrete." He saw the Jeep's front right tire was "blown out," producing "smoke and sparks" from the rim. Hamilton activated the lights and sirens on his police vehicle and attempted to stop the Jeep. However, the Jeep "sped off erratically" and Hamilton followed.

The Jeep's driver drove the wrong direction down a one-way street, continued at "a high rate of speed," hit a speed bump, lost control of the car, and drove into a median on Fourteenth Street. At the same time, Ronald Coleman drove down Fourteenth Street, heard "tires screech," and saw a white Jeep behind him traveling at "high speed." Although Ronald moved over to allow the Jeep to pass, it "rammed" the rear of Ronald's car. The impact propelled Ronald's car forward, causing it to strike a third vehicle parked alongside the curb. The third vehicle then hit a fourth car as part of a "chain reaction." Ronald went to the hospital to treat a cut to his forehead.

4

Prior to the crash, Priscilla had been visiting with her uncles and cousin at their home. Her car was parked on Fourteenth Street. Unfortunately, as she walked to her car, Priscilla became crushed between two parked cars involved in the "chain reaction" collision on Fourteenth Street. Police officers and members of Priscilla's family tried to aid her. Priscilla was eventually extricated and went to the hospital. She later died from internal bleeding and other significant injuries caused by the chain reaction collision.

After the collision, the Jeep fled on foot, headed north on Fourteenth Street, and turned down a driveway.

Officer Hamilton intended to follow the Jeep, but remained at the scene to help Priscilla. Between his own observations and his dashcam video, Hamilton observed the fleeing suspect was a Black male, roughly 5'9," wearing a white t-shirt, dark jeans, and gloves. Priscilla's uncle, Dylan, saw a man in the middle of Fourteenth Street immediately after the crash. Dylan described the man as dark-skinned, roughly 5'9", and "not a fat person."

D.  Investigation and Arrest

The police investigation of the incidents on May 5, 2018 included witness interviews, forensic examinations, and review of surveillance video footage. The police learned the Jeep belonged to Kenneth Washington, who reported his

5

car missing late on the night of the fatal crash. According to Washington, he had a grey jacket with a red lining inside his Jeep.

Video footage from area surveillance cameras placed the Jeep near where Kyon was shot between 9:22 and 9:47 p.m. on May 5, 2018. The footage showed a man wearing white sneakers, a white t-shirt, a heavy grey coat with red lining, gloves, and a mask exit the Jeep at 9:42 p.m. At 9:43 p.m., the footage showed people running, leading officers to pinpoint the firing of gunshots at that precise time. Around 9:47 p.m., the man in the grey coat ran back to the Jeep.

When investigators searched the Jeep pursuant to a search warrant, they found a grey jacket with a red lining. Inside the Jeep, the police also found a spent shell casing marked "R-P 9-millimeter Luger." In the area where Kyon was shot, the police found three nine-millimeter Winchester casings also marked "Luger." Further, the police found bullet fragments nearby. As part of the investigation, the police found a "Glock Model 43 handgun" on the roof of a garage on Fourteenth Street, near the crash site. The recovered gun contained Winchester nine-millimeter ammunition. Ballistic testing on the recovered Glock matched the spent cartridges recovered from the area where Kyon was shot.

6

Police also swabbed the Jeep's steering wheel for biological evidence. The sample collected by the police contained DNA matching defendant. Additionally, the police swabbed the Glock and tested it for DNA, but the results were not a match for defendant. Instead, the DNA testing matched an individual named Kenneth Gunter. The police dismissed Gunter as a suspect in the crime spree because he did not fit the physical description of the person seen fleeing the Jeep. According to Gunter's driver's license, he stood 6'3" tall and weighed 200 pounds. Witnesses described the suspect as approximately 5'8" tall with a "thin build."

In his brief statement to the police on May 10, 2018, while he remained in the hospital recovering from surgery after the shooting, Kyon described the shooter as 5'9," wearing a green jacket and mask. In that statement, Kyon never indicated he saw the shooter's face, nor did the police ask whether he could identify the suspect.

In December 2018, the police composed a photo array based on the DNA results. The array contained defendant's photograph, plus five "filler photographs" of individuals with "similar characteristics." The police presented the array to Kyon to see if he could identify the shooter.

A-4007-21

When the array was administered on December 19, 2018, Kyon immediately identified defendant as the shooter. After viewing the array, Kyon said he was a "thousand percent" certain the person in the photograph he selected was the person who shot him. The police issued a warrant for defendant's arrest the same day. After an extended search, the police eventually arrested defendant on June 10, 2019.

## II.

In December 2019, defendant was charged in Essex County superseding indictment, with one count each of first-degree felony murder, N.J.S.A. 2C:11-3(a)(3), first-degree aggravated manslaughter, N.J.S.A. 2C:11-4(a)(2), first-degree carjacking, N.J.S.A. 2C:15-2(b)(2), second-degree conspiracy to commit carjacking, N.J.S.A. 2C:5-2(b)(1) and 15-2(b)(2), second-degree aggravated assault, N.J.S.A. 2C:12-1(b)(1), second-degree conspiracy to commit aggravated assault, N.J.S.A. 2C:5-2(a)(1) and N.J.S.A. 2C12-1(b)(1), and second-degree vehicular homicide, N.J.S.A. 2C11-5(a). In addition, defendant was charged with two counts each of second-degree unlawful possession of a weapon, N.J.S.A. 2C:39-5(b)(1), and second-degree possession of a weapon for an unlawful purpose, N.J.S.A. 2C:39-4(a)(1).

On June 21, 2021, defendant moved to suppress Kyon's identification testimony or, in the alternative, for a Wade/Henderson[3] hearing. The judge heard argument on July 2, 2021 and reserved decision. In a written decision and order dated August 6, 2021, the judge denied defendant's motion.

On February 14, 2022, defendant moved to admit as evidence at trial Kyon's 2008 conviction for fourth-degree false incrimination. The judge addressed the issue with counsel via email and later discussed the motion on the record on March 8, 2022. The next day, immediately prior to opening statements, the judge ruled Kyon's 2008 conviction was inadmissible. On March 14, 2022, during the trial and after Kyon testified, the judge issued a written order and opinion explaining his reasons for denying admission of the 2008 conviction.

Trial took place over thirteen days between March 9 and March 30, 2022. Defendant elected not to present a case-in-chief. On March 30, 2022, the jury found defendant guilty on all counts.

On June 6, 2022, defendant filed a pro se motion for a new trial. In a June 22, 2022 order, the judge denied the motion as untimely.

---

[3] United States v. Wade, 338 U.S. 218 (1967); State v. Henderson, 208 N.J. 208 (2011).

Defendant appeared for sentencing on July 11, 2022. The judge granted the State's motion to sentence defendant as a persistent offender, eligible for discretionary extended terms, pursuant to N.J.S.A. 2C:44-3(a). After ordering the appropriate mergers, the judge issued a thirty-year prison term on the felony murder conviction with a thirty-year parole disqualifier, an extended prison sentence of sixteen years, subject to the No Early Release Act (NERA), N.J.S.A. 2C:43-7.2, with an eighty-five percent parole disqualifier on the aggravated assault conviction, and a ten-year prison sentence with a five-year parole disqualifier on each weapons conviction. The judge dismissed the conspiracy convictions and the merged offenses.

The judge ordered the ten-year sentences for weapons charges and the sixteen-year sentence for aggravated assault be served concurrently to each other but consecutively to the thirty-year sentence for felony murder. As a result, defendant received an aggregate sentence of forty-six years with a parole ineligibility period of forty-three years, seven months, and four days.

On appeal, defendant raises the following arguments:

POINT I

> THE TRIAL COURT ERRED IN DENYING DEFENDANT'S MOTION TO ADMIT . . . COLEMAN'S PRIOR CONVICTION FOR MAKING A FALSE INCRIMINATION.

POINT II

THE TRIAL COURT ERRED WHEN IT DENIED DEFENDANT'S MOTION TO SUPPRESS . . . COLEMAN'S OUT-OF-COURT AND IN-COURT IDENTIFICATION OF DEFENDANT.

POINT III

THE TRIAL COURT DENIED DEFENDANT A COMPLETE DEFENSE WHEN IT SUSTAINED THE STATE'S OBJECTION TO TRIAL COUNSEL INQUIRING INTO . . . GUNTER'S CRIMINAL BACKGROUND AND WHETHER POLICE HAD INVESTIGATED HIM AS A POSSIBLE SUSPECT.

POINT IV

THE TRIAL COURT ERRED WHEN IT DENIED THE DEFENSE REQUEST FOR A LIMITING INSTRUCTION AS TO DETECTIVE SCHNEIDERMAN'S TESTIMONY.

POINT V

THE TRIAL COURT'S CUMULATIVE ERRORS DENIED DEFENDANT A FAIR TRIAL.

POINT VI

THE TRIAL COURT'S DENIAL OF DEFENDANT'S PRO SE MOTION FOR A NEW TRIAL AS IT WAS FILED LATE WAS MANIFESTLY UNFAIR.

POINT VII

THE IMPOSITION OF MULTIPLE CONSECUTIVE SENTENCES WAS MANIFESTLY UNFAIR AND EXCESSIVE.

III.

We first address defendant's argument that the judge erred in denying his motion to suppress Kyon's identification of him as the shooter. He claims the photo array was tainted by an outside source which the police never explored. At a minimum, defendant asserts the judge should have conducted an evidentiary hearing to further address the issue. We disagree.

We defer to a trial judge's evidentiary ruling, including the admissibility of an eyewitness identification, absent an abuse of discretion. State v. Garcia, 245 N.J. 412, 430 (2021). Under that deferential standard, we "review a trial court's evidentiary ruling only for a 'clear error in judgment.'" State v. Medina, 242 N.J. 397, 412 (2020) (quoting State v. Scott, 229 N.J. 469, 479 (2017)). Additionally, we review the denial of a Wade/Henderson hearing for abuse of discretion. State v. Ruffin, 371 N.J. Super. 371, 391 (App. Div. 2004). Similarly, we will uphold the admission of an out-of-court identification so long as it is supported by sufficient credible evidence in the record. State v. Wright, 444 N.J. Super. 347, 356 (App. Div. 2016) (citing State v. Johnson, 42 N.J. 146,

161 (1964)). "[R]eview of the trial court's application of the law to the facts, however, is plenary." Id. at 357; see also Rowe v. Bell & Gossett Co., 239 N.J. 531, 552 (2019) (quoting Manalapan Realty, L.P. v. Twp. Comm. of Manalapan, 140 N.J. 366, 378 (1995)).

Under Henderson, "to obtain a pretrial hearing [on the admissibility of an eyewitness identification], a defendant has the initial burden of showing some evidence of suggestiveness that could lead to a mistaken identification." 208 N.J. at 288. Such a showing must be based on evidence of suggestiveness stemming from system variables, "factors like lineup procedures which are within the control of the criminal justice system." Id. at 218. System variables include whether an identification was administered blindly and without post-identification feedback, whether the pre-lineup instructions and the lineup itself were properly designed, whether a witness viewed a suspect multiple times, whether the images in a lineup were presented simultaneously or sequentially, whether a composite sketch was developed, and whether a single suspect "showup" procedure was conducted. Id. at 248-61. Additionally, evidence of misidentification may be demonstrated by suggestive conduct of third-party actors. Id. at 247, 268-71 (citing State v. Chen, 208 N.J. 307, 322-23 (2011)).

A-4007-21

"[W]hen a defendant presents evidence that an identification was made under highly suggestive circumstances that could lead to a mistaken identification," including those brought about by a third party, a trial judge should grant a preliminary hearing. Chen, 208 N.J. at 311, 322. However, the defendant must show "some evidence of highly suggestive circumstances." Id. at 327.

If a defendant produces some evidence of significant suggestiveness, "the State must then offer proof to show that the proffered eyewitness identification is reliable—accounting for system and estimator variables." Henderson, 208 N.J. at 289. Estimator variables, which are outside the control of the legal system, include stress, weapon focus, duration, distance and lighting, witness characteristics, memory decay, race-bias, opportunity to view the criminal, degree of attention, accuracy of prior descriptions, level of certainty demonstrated at identification before feedback, and time between the crime and confrontation. Id. at 291-93. However, "eyewitness identification evidence will likely not be ruled inadmissible at pretrial hearings solely on account of estimator variables." Id. at 294. Rather, the presence and impact of estimator variables may be explored on cross-examination and factored into the issuance of proper jury instructions. Id. at 294, 296-98. Ultimately, the "burden remains

14

on the defendant to prove a very substantial likelihood of irreparable misidentification." Id. at 289. After weighing the evidence, if the judge determines the defendant has met this burden, "the court should suppress the identification evidence." Ibid.

Here, while at the hospital after the shooting, Kyon gave a brief statement to the police. In that statement, Kyon indicated the shooter was roughly 5'9" and wore a ski mask. Seven months later, Kyon selected defendant's picture from a photo array, identifying him as the shooter and indicating a high level of confidence.

In seeking to suppress Kyon's identification, defendant argued that police violated their obligation under Henderson, 208 N.J. at 270, by failing to ask Kyon at the time of the array if he spoke to any third parties about the suspect's identity. Because Kyon's wife and sister-in-law also witnessed the shooting, defendant argued Kyon likely had "at least some communication" with a third party about the shooter's identity. Further, defendant argued Kyon's "story . . . significantly changed" between the night of the shooting and the administration of the photo array. Defendant also identified several estimator variables he intended to address at the requested hearing.

A-4007-21

The judge denied the suppression motion without a hearing. The judge noted defendant failed to produce affirmative evidence of third-party interference regarding identification of the suspect, stating, "[d]efendant speculates that the witness communicated" and presented "no evidence . . . that such actions or discussions actually occurred." Based on Kyon's high degree of confidence in identifying the suspect and signing the identification statement presented by the police, the judge concluded "the identification techniques were not impermissibly suggestive so as to result in irreparable misidentifications." Thus, the judge held defendant was not entitled to a hearing on the issue.

We reject defendant's argument that Kyon's identification was unreliable, triggering the need for an evidentiary hearing. The judge did not abuse his discretion in denying defendant's suppression motion because defendant failed to adduce evidence of suggestiveness other than sheer speculation. Although the police failed to inquire whether Kyon was influenced by anyone prior to identifying defendant from the photo array, there is no evidence in the record to suggest Kyon was impermissibly influenced by third parties prior to identifying defendant as the shooter.

Nor do we agree that Kyon significantly changed his statement to the police between May 2018 and December 2018. Kyon's May 2018 statement was

taken at the hospital five days after the shooting, the same day he awoke from a medically induced coma. The officer conducting the hospital interview explained the session was brief due to Kyon's medical condition. During this brief interview, Kyon provided the suspect's height and identified the shooter as wearing a green jacket and black mask. The interviewing officer never asked if Kyon saw the shooter's face. When asked to identify the suspect several months later, after Kyon recovered from his surgeries, Kyon understandably offered more information than before.

On this record, we agree defendant failed to meet his burden of producing the type of highly suggestive evidence to warrant a hearing. Thus, the judge correctly denied defendant's motion to suppress the out-of-court identification.

IV.

We next consider defendant's argument that the judge erred in denying his motion to admit Kyon's 2008 conviction for false incrimination as impeachment evidence. The judge determined the 2008 conviction was inadmissible under N.J.R.E. 609(b) because it was more than ten years old and its probative value did not outweigh its likely prejudicial effect.

N.J.R.E. 609 governs the admission of prior convictions for the purpose of impeachment. Generally, evidence of prior convictions "shall be admitted"

to attack the credibility of the previously convicted witness. N.J.R.E. 609(a)(1). However, when the latter of either the date of conviction or release from confinement occurred more than ten years before the start of trial, the conviction "is admissible only if the court determines that its probative value outweighs its prejudicial effect, with the proponent of that evidence having the burden of proof." N.J.R.E. 609(b)(1). In making this assessment, the court may consider:

> (i) whether there are intervening convictions for crimes or offenses, and if so, the number, nature, and seriousness of those crimes or offenses,
>
> (ii) whether the conviction involved a crime of dishonesty, lack of veracity or fraud,
>
> (iii) how remote the conviction is in time, [and]
>
> (iv) the seriousness of the crime.
>
> [N.J.R.E. 609(b)(2).]

N.J.R.E. 609(b) "creates a presumption that a conviction more remote than ten years is inadmissible for impeachment purposes," unless the proponent can show that the probative effect of the evidence outweighs its inherent prejudice. State v. R.J.M., 453 N.J. Super. 261, 266-67 (App. Div. 2018). As with other evidentiary rulings, we review a trial judge's decision on admission of a prior conviction under N.J.R.E. 609 for abuse of discretion. Garcia, 245 N.J. at 430.

Kyon had several prior convictions. In 2012 and again in 2015, he was convicted of third-degree possession of a controlled dangerous substance (CDS). In 2018, he was convicted of third-degree possession of CDS and third-degree manufacturing, distribution, or possession with intent to manufacture or distribute CDS. Prior to the trial, the judge granted defendant's application to admit Kyon's CDS convictions as impeachment evidence.

However, the judge declined to admit Kyon's 2008 conviction for fourth-degree false incrimination following his guilty plea to giving a false name to police. Police arrested Kyon during a traffic stop because he gave a false name to police and concealed marijuana in his clothing. Kyon was sentenced to a two-year probationary term and time served.

Prior to trial, defendant argued Kyon's multiple intervening CDS convictions, coupled with the 2008 conviction involving a "crime of dishonesty," met the requirements for admission of the 2008 conviction under the first and second factors of N.J.R.E. 609(b)(2). While the 2008 conviction was beyond the ten-year threshold, defendant asserted the conviction was "not substantially older" and therefore the remoteness factor did not weigh significantly in the N.J.R.E. 609(b)(2) analysis. Further, defendant argued the crime of false incrimination was amended by the legislature and constituted a

19

third-degree offense as of the time defendant faced trial, supporting the fourth factor under N.J.R.E. 609(b)(2). Additionally, defendant argued the 2008 conviction went directly to the issue of Kyon's credibility because Kyon offered different descriptions of the shooter in his first statement to police and his later statement to the police, presenting "a pitched credibility battle."[4] Defendant also asserted that absent Kyon's identification of defendant as the shooter, the State lacked a case against him as to the attempted murder, aggravated assault, and weapons charges. Because defendant challenged Kyon's credibility and veracity, defendant contended the probative value of Kyon's 2008 conviction outweighed any prejudice.

In denying the motion, the judge reviewed the factors under N.J.R.E. 609(b)(2). The judge concluded the prior CDS offenses were not "violent or extremely serious" offenses and therefore did not weigh heavily in his analysis under the first factor. Next, the judge found "a false incrimination conviction can only fairly be stated to involve a crime of dishonesty, lack of veracity, or fraud" and thus found the second factor weighed in defendant's favor.

The judge focused his analysis on the third factor, remoteness of the 2008 conviction. He found that the passage of fourteen years since the 2008

---

[4] State v. Frisby, 174 N.J. 583, 593-94 (2002).

conviction was "significantly more than" the ten-year cutoff, and that factor weighed in favor of the State. The judge also held the fourth factor, the seriousness of the crime, weighed in the State's favor because both third and fourth-degree crimes were "among the lowest degrees in our criminal justice system, reflecting an understanding that these types of crimes are not the most serious." Further, the judge explained the 2008 conviction involved a motor vehicle violation and possession of a small amount of marijuana. Thus, the judge concluded the offenses were not so serious and weighed in favor of the State. Based on these findings, the judge held defendant failed to prove the probative value of the evidence outweighed its prejudicial effect.

Further, the judge determined the admission of Kyon's 2008 conviction would violate N.J.R.E. 403. Based solely on the name assigned to the offense leading to Kyon's 2008 conviction, the judge noted there was a risk the jury could impermissibly conclude Kyon was likely to incriminate defendant falsely. The judge granted defendant's motion to admit Kyon's more recent CDS convictions for impeachment purposes.

Because attacking Kyon's credibility was central to the defense strategy, defendant contends that the judge's ruling denied him "a meaningful opportunity to present a complete defense." State v. Garron, 177 N.J. 147, 168 (2003). A

21

"defendant enjoys a fundamental constitutional right to a fair trial, which necessarily includes the right to present witnesses and evidence in his own defense." State v. Jenewicz, 193 N.J. 440, 451 (2008) (citing Washington v. Texas, 388 U.S. 14, 19 (1967)). "Although fundamental, a defendant's right to present a defense is not absolute." Ibid. (citing Montana v. Egelhoff, 518 U.S. 37, 42 (1996)).

Even if the judge erroneously determined Kyon's 2008 conviction was inadmissible, we conclude any error was harmless considering the totality of the evidence against defendant in this case. There was other sufficient and credible evidence in the record linking defendant to the crime spree on May 5, 2018. Thus, we are satisfied precluding the admission of Kyon's 2008 conviction was not clearly capable of producing an unjust result.

V.

We next consider defendant's argument that the judge deprived him of the right to "a complete defense and a fair trial" by disallowing certain questions regarding Gunter's criminal history. At one point, Gunter was a person of interest in the case based on DNA evidence linking him to the gun recovered on the garage roof. The police pursued Gunter "briefly," but abandoned any theory

that he was the shooter because his physical characteristics did not match the shooter's description.

While cross-examining Detective Matthew Schneiderman, defense counsel asked whether the police took "any other investigative steps or actions" to link Gunter to the shooting or determine whether Gunter had a criminal record, including unlawful possession of a weapon. The State objected to defense counsel's cross-examination of the detective regarding Gunter's criminal history. The judge sustained the objection, ruling the testimony's probative value was outweighed "by potential for misleading the jury, and confusing the issues."

We defer to a trial court's decision to admit or exclude evidence unless the court abused its discretion. Garcia, 245 N.J. at 430. N.J.R.E. 403 provides that evidence "may be excluded if its probative value is substantially outweighed by the risk of" either "[u]ndue prejudice, confusion of issues, or misleading the jury," or "[u]ndue delay, waste of time, or needless presentation of cumulative evidence." N.J.R.E. 404(b)(1) provides that "evidence of other crimes, wrongs, or acts is not admissible to prove a person's disposition in order to show that on a particular occasion the person acted in conformity with such disposition."

23

Defendant is entitled to "a meaningful opportunity to present a complete defense," which includes the "right to introduce evidence of third-party guilt." State v. R.Y., 242 N.J. 48, 66 (2020) (quoting Garron, 177 N.J. at 168; and then quoting State v. Cotto, 182 N.J. 316, 332 (2005)).  Evidence of third-party guilt "must be capable of demonstrating some link between the [third-party] evidence and the victim or the crime."  Id. at 67 (quoting State v. Perry, 225 N.J. 222, 239 (2016)).  And, even if evidence meets this standard, the court must still "determine whether it would be admissible under the New Jersey Rules of Evidence."  Id. at 69.

In this case, defense counsel was permitted to ask questions relevant to a third-party guilt defense, including the thoroughness of the police investigation of Gunter as a suspect.  However, the judge did not allow defense counsel to inquire about any particular charges against Gunter as such information was not capable of establishing a link between Gunter and offenses in this case.  Despite this limitation, defense counsel presented a third-party guilt defense to the jury and argued during summation that the police did a less-than-adequate job in their investigation of Gunter as a suspect.

Even if the judge erred in limiting defense counsel's questioning of Schneiderman, the error was harmless.  The "harmless error standard  . . .

24

requires that there be some degree of possibility that [the error] led to an unjust result. The possibility must be real, one sufficient to raise a reasonable doubt as to whether [it] led the jury to a verdict it otherwise might not have reached." State v. Ingram, 196 N.J. 23, 49 (2008) (alteration in original) (quoting State v. R.B., 183 N.J. 308, 330 (2005)).

In reviewing the record, defense counsel asked numerous questions about Gunter and the extent to which police investigated him as a suspect. Further, given that evidence suggesting two people were involved in the May 5, 2018 crime spree, inculpating Gunter as a suspect would not have exonerated defendant. Thus, we are satisfied the judge did not abuse his discretion in precluding questions about Gunter's criminal record.

## VI.

Next, defendant argues the judge erred in failing to issue a limiting instruction regarding Schneiderman's testimony concerning the forensic investigation of the Jeep. The detective told the jury that the State Police forensic laboratory would not accept certain samples for testing. Based on his training and experience with the forensic laboratory's testing procedure, Schneiderman instructed another officer to swab only the Jeep's steering wheel and not the door handle or gear shift. Defense counsel asked the judge to issue

a limiting instruction advising the jury that the witness "cannot testify as to what other people who are not him are thinking when they do or do not accept or reject certain pieces of evidence."

The judge denied defense counsel's request for a limiting instruction. The judge noted defense counsel "put into play what decisions were made to do what and why," and by extension, "called into question the decisions that this witness made [and] why." In denying defendant's request for a limiting instruction, the judge stated defense counsel could address the issue on cross-examination and renew the application for an instruction, if necessary, after completing cross-examination of the witness.

On continued cross-examination, Schneiderman agreed the swab from the Jeep's steering wheel was "the only DNA swab that was taken from either the car itself or any other items in" the vehicle. Defense counsel had Schneiderman list items recovered at or near the scene which were not tested for DNA. Defense counsel also highlighted that Schneiderman never made any written record of his reasons for limiting DNA testing to the Jeep's steering wheel. Even though three forensic scientists with the New Jersey State Police testified after Schneiderman, neither party's counsel asked if Schneiderman's understanding of the forensic laboratory's testing policies was accurate.

26

As stated previously, we review a trial judge's evidentiary rulings under an abuse of discretion standard. Garcia, 245 N.J. at 430. N.J.R.E. 105 provides: "When evidence is admitted as to one party or for one purpose but is not admissible as to another party or for another purpose, the court, upon request, shall restrict the evidence to its proper scope and shall instruct the jury accordingly."

Here, Schneiderman never testified about statements, opinions, or mindsets of other forensic experts in the State Police Laboratory. Further, based on his own personal experience in submitting crime scene evidence for testing, Schneiderman explained why certain samples would or would not be accepted by the forensic laboratory. Schneiderman never offered testimony as to why the forensic laboratory accepted or rejected samples. Schneiderman's testimony focused on his own perceptions based on his extensive dealings with the forensic laboratory. If Schneiderman's testimony was not an accurate reflection of the forensic laboratory's policy, defense counsel had ample opportunity to present evidence to that effect but did not do so.

Even if the judge erred by declining to give a limiting instruction on this issue, such an error was harmless in this case. Here, the State Police forensic laboratory found defendant's DNA on the Jeep's steering wheel.

27

## VII.

We reject defendant's argument that cumulative errors during the course of his trial warrant a reversal of his convictions.  "[E]ven when an individual error or series of errors does not rise to reversible error, when considered in combination, their cumulative effect can cast sufficient doubt on a verdict to require reversal."  Jenewicz, 193 N.J. at 473.  "Where the aggregation of legal errors renders a trial unfair, a new trial is required."  State v. T.J.M., 220 N.J. 220, 238 (2015).  However, this principle does not apply "where no error was prejudicial and the trial was fair."  Ibid.  (quoting State v. Weaver, 219 N.J. 131, 155 (2014)).

Defendant failed to demonstrate any error or pattern of errors rising to the level, either singly or cumulatively, that denied him a fair trial.  "A defendant is entitled to a fair trial but not a perfect one."  R.B., 183 N.J. at 334 (quoting Lutwak v. United States, 344 U.S. 604, 619 (1953)).

## VIII.

We next consider defendant's argument that the judge erred in dismissing defendant's pro se motion for a new trial as untimely.  The judge found the motion was filed outside the ten-day window under Rule 3:20-2 and declined to address the merits of defendant's arguments.

We review legal conclusions, including the interpretation of the court rules and statutes of limitation, de novo. See State v. Dickerson, 232 N.J. 2, 17 (2018) (court rules); Save Camden Pub. Schs. v. Camden City Bd. of Educ., 454 N.J. Super. 478, 487 (App. Div. 2018) (statute of limitations). Rule 3:20-1 provides that a "trial judge on defendant's motion may grant the defendant a new trial if required in the interest of justice." The time in which such a motion can be made is governed by the nature of the motion:

> A motion for new trial based on the ground of newly-discovered evidence may be made at any time, but if an appeal is pending, the court may grant the motion only on remand of the case. A motion for a new trial based on a claim that the defendant did not waive his or her appearance for trial shall be made prior to sentencing. A motion for a new trial based on any other ground shall be made within [ten] days after the verdict or finding of guilty, or within such further time as the court fixes during the [ten]-day period.
>
> [R. 3:20-2.]

In this case, the jury rendered its verdict on March 30, 2022. Defendant filed his pro se motion for a new trial hand-dated June 6, 2022, and file-stamped June 20, 2022.

We are satisfied the judge did not err in dismissing defendant's new trial motion as time-barred. Rule 3:20-2 provides that a motion for a new trial shall generally be made "within 10 days after the verdict or finding of guilty, or within

29

such further time as the court fixes during the 10-day period."  The rule provides the court with discretion to enlarge the ten-day window but only if the allowance is made "during the [ten]-day period."  Ibid.

Defendant asserts Rule 1:1-2(a) allows for the relaxation of any rule "if adherence to it would result in an injustice . . . [u]nless otherwise stated." Defendant overlooks Rule 1:3-4(c), stating "[n]either the parties nor the court may, however, enlarge the time specified by . . . R. 3:20-2."  Thus, contrary to defendant's argument, the relaxation provision under Rule 1:1-2(a) is inapplicable because Rule 1:3-4(a) states otherwise.

Consistent with the court rules, the judge was required to enforce the time bar under Rule 3:30-2.  Thus, we are satisfied the judge did not err in denying defendant's motion for a new trial.

## IX.

We next address defendant's argument that the judge erred in imposing consecutive sentences by incorrectly applying State v. Yarbough, 100 N.J. 627 (1985).  We reject this argument.

We review a sentencing determination under a deferential standard.  State v. Grate, 220 N.J. 317, 337 (2015).  "On appellate review, the court will apply an abuse of discretion standard to the sentencing court's explanation for its

sentencing decision within the entire range." State v. Pierce, 188 N.J. 155, 169-70 (2006). The deferential standard of review applies "only if the trial judge follows the [Criminal] Code and the basic precepts that channel sentencing discretion.'" State v. Trinidad, 241 N.J. 425, 453 (2020) (quoting State v. Case, 220 N.J. 49, 65 (2014)).

With respect to a decision whether to impose concurrent or consecutive sentences, a sentencing court should adhere to the principle that "there can be no free crimes in a system for which the punishment shall fit the crime." State v. Carey, 168 N.J. 413, 422 (2001) (quoting Yarbough, 100 N.J. at 643). Thus, a sentencing court should consider the extent to which:

> (a) the crimes and their objectives were predominantly independent of each other;
>
> (b) the crimes involved separate acts of violence or threats of violence;
>
> (c) the crimes were committed at different times or separate places, rather than being committed so closely in time and place as to indicate a single period of aberrant behavior;
>
> (d) any of the crimes involved multiple victims; [and]
>
> (e) the convictions for which the sentences are to be imposed are numerous.
>
> [Carey, 168 N.J. at 422-23 (quoting Yarbough, 100 N.J. at 644).]

A sentencing judge is required to weigh these criteria qualitatively rather than quantitatively. Id. 427-28. A sentencing judge must also separately state the reasons for imposing a concurrent or consecutive sentence in the sentencing decision. Yarbough, 100 N.J. at 643. Further, a proper Yarbough sentencing assessment requires the judge provide "[a]n explicit statement explaining the overall fairness of a sentence imposed on a defendant for multiple offenses in a single proceeding or in multiple sentencing proceedings." State v. Torres, 246 N.J. 246, 268 (2021).

Here, the judge ordered the thirty-year felony murder sentence be served consecutively to all others, resulting in an aggregate sentence of forty-six years. In addressing the Yarbough factors as applied to the assault and murder convictions, the judge found that they were "two separate crimes with predominantly independent objectives." The judge stated the objective of the assault was to "perpetrate an act of violence against [Kyon]," while the acts leading to Priscilla's death were done "to [e]llude the police." Thus, the judge determined each crime "involve[d] separate acts of violence against two different individuals." The judge further found the acts were "committed at different times, in separate locations, rather than being [committed] so closely in time and place as to indicate a single period of abhorrent behavior." He

explained defendant shot Kyon on Hayes Street, committed the intervening carjacking on Seventeenth Street, and killed Priscilla on Fourteenth Street. The judge properly assessed the overall sentence in light of the nature and number of the offenses, as well as the aggravating and mitigating factors, and determined the sentence imposed was fair under the circumstances.

Having reviewed the record, we are satisfied the sentencing judge's factual findings that the shooting of Kyon and the collision that killed Priscilla were unconnected and separated by time and location such that the acts were not part of the same incident is supported by the record. The judge followed the applicable law, rendered factual findings, and his findings are sufficiently supported by the evidence. Thus, the sentencing judge did not abuse his discretion in imposing consecutive terms.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

33